**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| DAWN M. ROBERTSON,<br>on behalf of Plaintiff and the<br>class members described herein,<br><br>                   Plaintiff,<br><br>vs.<br><br>QC FRANCHISE GROUP LLC, doing<br>business as QC Kinetix;<br>REGENERATIVE HEALTH OF<br>CHAMPAIGN, LLC, doing business as<br>QC Kinetix - Champaign**;**<br>MED-DEN FUNDING, LLC,<br>doing business as Proceed Finance;<br>and SECURITY FIRST BANK;<br><br>                   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:23-cv-03333 |

<u>**COMPLAINT  – CLASS ACTION**</u>

**INTRODUCTION**

1.      Plaintiff Dawn M. Robertson brings this action to secure redress for false and

misleading advertising in (a) promoting non-FDA approved medical treatment and (b) financing

expensive medical procedures.

<u>**JURISDICTION AND VENUE**</u>

2.      This Court has jurisdiction under 28 U.S.C. §1332 (general diversity jurisdiction), 28

U.S.C. §1332(d) (Class Action Fairness Act), 18 U.S.C. §1964 (RICO), 28 U.S.C. §1331(general

federal question),  28 U.S.C. §1337 (interstate commerce) and 28 U.S.C. §1367 (supplemental

jurisdiction).

3.      This Court has personal jurisdiction over each Defendant because this case arises out

of transactions they knowingly engaged in within Illinois.

4. Venue is proper for the same reason.

**PARTIES**

5. Plaintiff Dawn M. Robertson is a citizen of Indiana who resides in Newport, Indiana.

6. Defendant QC Franchise Group LLC, is a South Carolina limited liability company with its principal office at 227 W. Trade Street, Suite 2160, Charlotte, NC 28202. It does business as QC Kinetix. On information and belief, it has three manager/ members, all of whom are residents and citizens of North Carolina or South Carolina, and none who is a citizen of Indiana.

7. QC Franchise Group LLC franchises a business enterprise consisting of offices that provide "non-surgical regenerative medicine services" using the QC Kinetix system. According to QC Franchise Group, LLC's franchise disclosure document, "The System is intended to enhance the practice of non-surgical regenerative medicine through the provision of attendant non-clinical services. Non-surgical regenerative medicine treatments are focused on musculoskeletal pain caused by injuries, arthritis, tendonitis, tendonopathies, muscle tears, ligaments tears and others. In 2022, we added hair restoration and in 2023 we expect to add Low Testosterone treatment packages."

8. Defendant Regenerative Health of Champaign, LLC, doing business as QC Kinetix - Champaign, is a Delaware limited liability company which operates a QC Franchise Group LLC franchise at 410 E. University Avenue, Champaign, IL 61820. Its registered agent and office is E. Zachary Dinardo, Sorling Northrup Hanna Cullen & Cochran, Ltd., 1 N. Old State Capitol Plaza, Suite 200, Springfield, IL 62701. It has three manager/ members, who on information and belief are citizens and residents of Illinois, and none of whom is a citizen of Indiana.

9. There are at least five operating franchisees of QC Franchise Group LLC in Illinois.

10. Defendant Med-Den Funding, LLC, doing business as Proceed Finance, is a

2

Nebraska limited liability company with offices at 425 Fallbrook Boulevard, Lincoln, NE 68521. It is engaged in the business of arranging financing for medical and dental procedures. According to its website (https://www.proceedfinance.com/), "Patient Financing Is Our Specialty And We're In It For The Long Haul." On information and belief, its member/ manager is a resident and citizen of Nebraska, and not of Indiana.

11.     Defendant Med-Den Funding, LLC, doing business as Proceed Finance, obtains much of its business through referral from medical and dental providers.  Its website has material "for providers" (https://www.proceedfinance.com/providers) which states that "Proceed Finance's extensive financing options and personalized customer service can truly transform your practice. Watch these providers explain how our platform and products have given them the opportunity to grow their practices and help even more patients."

12.     Defendant Security First Bank is a state chartered banking corporation with offices at 1300 Garret Lane, Lincoln, NE 68512.  It has more than 20 offices, all in Nebraska or South Dakota, and over $1.7 billion in assets.

## RELATIONSHIP BETWEEN DEFENDANTS

13.     QC Franchise Group LLC prescribes the contents of the treatment provided by franchisees such as Defendant Regenerative Health of Champaign, LLC.

14.     QC Franchise Group LLC  informs franchisees in its franchise disclosure document: "You must purchase medical kits only from us, or our designated affiliates. Medical kits contain an assemblage of proprietary components that our specified for each type of injection procedure provided every time a client receives a QC Kinetix® medical procedure at your Franchised Business. For any of these items, we have the right in our sole discretion to designate ourselves, our affiliates, or a third-party as the sole supplier for a particular item.  To the extent we do not designate a

particular supplier, you must purchase these items solely from suppliers who demonstrate, to our continuing reasonable satisfaction, the ability to meet our reasonable standards and specifications for such items, and who possess adequate quality controls and capacity to supply your needs promptly and reliably. Currently, Franchisees will be required to place all local TV and radio marketing and all digital marketing through our designated suppliers, and to purchase all medical kits from us. You are required to use our designated supplier for credit card processing."

15.     QC Franchise Group LLC provides an Operations Manual of several hundred pages, prescribing in detail how the franchised business is to be operated.

16.     QC Franchise Group LLC reserves the right to approve or disapprove samples of all advertising and promotional materials used by franchisees that it does not provide.

17.     Among other advertising means, QC Franchise Group LLC maintains a website for the benefit of itself and franchisees.  Franchisees are not permitted to have their own websites.

18.     QC Franchise Group LLC requires franchisees to obtain from it consulting services "regarding policies, equipment, products and services you are required to use and offer in your facility."  The franchisees also agree that QC Franchise Group LLC will "Provide additional on-site supervision and assistance as we deem necessary and in our discretion."

19.     Defendants Regenerative Health of Champaign, LLC and QC Franchise Group LLC arrange financing for their patients with Defendant Med-Den Funding, LLC, which in turn arranges loans from Defendant Security First Bank. On information and belief, there is a written agreement between either or both of Regenerative Health of Champaign, LLC and QC Franchise Group LLC, on the one hand, and Med-Den Funding, LLC, on the other. Exhibit A is an example of a Med-Den / provider agreement.

20.     Defendants Med-Den Funding, LLC and Defendant Security First Bank have a

continuing and formal relationship, the purpose of which is to have Med-Den Funding, LLC arrange financing for medical and dental procedures, with the loans nominally made by Security First Bank and also serviced by Security First Bank, which collects the consumer's payments.  The arrangement was memorialized in a series of written agreements, described in the Affidavit of Brent Corbin (Exhibit B)

21.     The Security First Bank website has a page headed "Proceed Finance" which states (https://security1stbank.com/proceed-finance/):

> Welcome to Security First Bank, your  loan servicer.
>
> There are two ways to make an online payment to your Proceed Finance loan: make a one-time payment or establish automatic, recurring payments.

The website then gives instructions for both.

22.     The Proceed Finance website has a page that lists "Proceed Finance Lending Partners."  It states that "Loans through Proceed Finance are made by Customers Bank and Security First Bank." (https://www.proceedfinance.com/lenders) It also refers to a "Secondary Lending Partner," LendingPoint.

23.     On information and belief, based on normal industry practices, there are written agreements between Med-Den Funding, LLC and Security First Bank, setting forth the roles of each in conducting their patient financing business.  Among other things, the agreements provide that:

   a.     Med-Den Funding, LLC is authorized to act as the agent of Security First Bank for the purpose of originating loans to patients,

   b.     Med-Den Funding, LLC must supply funds to a "Reserve Fund" maintained by Security First Bank.  Security First Bank maintains the fund, but 100% of the monies in the Reserve Fund are supplied by Plaintiff. Security First Bank withdraws money from  the Reserve Fund if a borrower is more than one

hundred and twenty days past due or if Security First Bank reasonably

determines that the loan was obtained by fraud.

The agreements are described in the Affidavit of Brent Corbin (Exhibit B).

### FACTS RELATING TO PLAINTIFF

24.     Plaintiff suffered from joint pain (including shoulder, hip and lower back pain caused

by a pinched nerve). On or about July 2023, she heard about QC Kinetix and looked up the website,

operated by QC Franchise Group.  Plaintiff desperately desired relief from her pain.

25.     Plaintiff reviewed the website and saw nothing about the treatment not being

approved by the Food & Drug Administration ("FDA"). No such disclosure is made there.

26.     Plaintiff contacted QC Franchise Group LLC and was referred to the Champaign,

Illinois franchise, Regenerative Health of Champaign, LLC.

27.     Plaintiff was given an appointment late on July 18, 2023, at about 4.00 p.m.

28.     Plaintiff was seen by a physician's assistant, who gave her an EKG and took her

blood pressure. QC Franchise Group did not take any images, include x-rays, MRI's or CAT Scans,

nor did it review any of Plaintiff's prior medical records regarding the cause of her pain. Back pain

cases by disks impinging on nerves, for example, normally requires different treatments than back

pain caused by other issues.

29.     Plaintiff was then subjected to a high-pressure sales presentation by a different QC

Kinetix employee, Tawny Dyche.  During the discussion with Ms. Dyche, Plaintiff mentioned her

occasional shoulder pain and asked if the treatment might help it as well. Ms. Dyche told Plaintiff

that in order to get the "absolute best results" she should treat both hips and both shoulders, even

though she was not having pain on both sides.  Ms. Dyche offered reduced prices based on how

many joints were treated. Plaintiff was flustered and rushed by the sales pitch, but wanted relief from

her pain, and was eventually convinced to try the "therapy" offered by QC Franchise Group LLC

and Regenerative Health of Champaign, LLC, for the price of $20,000.

30.     Although Plaintiff went to QC Kinetix primarily seeking relief from her sciatic pain,

which originates from nerves in the lower back, QC injected her hips and shoulders immediately

after the high pressure sales pitch.

31.     The "therapy" was supposed to consist of five treatment sessions.

32.     Plaintiff was given documents describing the treatments (Exhibit C).

33.     These documents are standard forms.

34.     None of these documents stated that the treatments were not approved by the FDA.

35.     On information and belief, based on the statements in the franchise disclosure

document, the content of these documents was provided by QC Franchise Group LLC.

36.     After the first treatment session, on July 18, 2023, Plaintiff was asked to sign

additional documents on a tablet-type device presented to her by a non-doctor. Plaintiff was rushed

through the signature process and not given sufficient time to review the documents. (Exhibit D)

37.     These documents stated that the treatments "have not been authorized by FDA or

treatment of my condition, but that they are being administered by my medical provider as part of

the practice of medicine because s/he believes they may provide some benefit for the condition

listed above."

38.     Plaintiff did not see a medical doctor at any time at Regenerative Health of

Champaign, LLC.

39.     Plaintiff was handed a folder containing paper copies of the documents as she was

leaving.

40.     To pay for the $20,000, Plaintiff was sent and signed a loan agreement a few days

later. (Exhibit E) The loan agreement required Plaintiff to pay interest at the rate of 12.99% on the cost of the treatments, to be paid in 72 payments of $401.50. The lender named in the loan agreement is Defendant Security First Bank.  The loan documents did not include a required disclosure regarding the maximum Illinois interest rate.

https://www.ilga.gov/commission/jcar/admincode/038/038002170001000R.html#:~:text=All%2 0retail%20installment%20contracts%20or,contract%2C%20as%20calculated%20under%20the

41.    The financing was arranged by Defendant Med-Den Funding, LLC, doing business as Proceed Finance. The documents misstated Plaintiff's name; this was corrected.

42.    The documents in Exhibit E are standard forms.

43.    The documents in Exhibit E state, "I understand and agree that this Note will be governed by the laws of the State of Nebraska except to the extent that federal law controls."

44.    The documents were provided to Plaintiff by interstate wire transmission, to her cell phone.

45.    Prior to providing financing documents to Plaintiff,  Defendants Security First Bank and/ or Med-Den Funding, LLC pulled Plaintiff's credit reports, also by interstate wire transmissions to and from one or more credit bureaus.

46.    Prior to providing financing documents to Plaintiff,  Defendants Security First Bank and/ or Med-Den Funding, LLC had Plaintiff provide information about herself by interstate wire transmission.

47.    It is the standard practice of Defendant Security First Bank and Defendant Med-Den Funding, LLC to provide financing documents to consumers by interstate wire transmission to cell phones, computers and other electronic devices.

48.    It is the standard practice of Defendant Security First Bank and Defendant Med-Den

8

Funding, LLC to pull the credit reports of consumers via interstate wire  transmissions to and from credit bureaus.

49.    It is the standard practice of Defendant Security First Bank and Defendant Med-Den Funding, LLC to obtain information about consumers by interstate wire transmission from cell phones, computers and other electronic devices.

50.    Defendant Med-Den Funding, LLC, doing business as Proceed Finance holds itself out as "the patient financing experts" (Exhibit F). The loans are made by Security First Bank, but are not offered on the Bank's website; they are only offered through Med-Den Funding, LLC.

51.    Defendant Med-Den Funding, LLC, doing business as Proceed Finance, handles the origination of loans nominally made by Security First Bank, and acts as the agent of Security First Bank for that purpose.

52.    Of the $20,000 loan to Plaintiff, about $19,220 was disbursed to Regenerative Health of Champaign, LLC immediately after Plaintiff signed loan documents, and before the completion of services.

53.    It is the standard practice of Defendants Med-Den Funding, LLC and Security First Bank to disburse loans made to fund medical and dental treatment upon signing of loan documents, before the completion of treatment.

54.    Plaintiff had no prior relationship with Med-Den Funding, LLC or Security First Bank.

55.    On information and belief, QC Franchise Group LLC arranged the financing, on behalf of and with the involvement of  Regenerative Health of Champaign, LLC.

56.    Because QC Franchise Group LLC and  Regenerative Health of Champaign, LLC arranged the financing, pursuant to a written agreement for the origination of financing, the loan

documents were required to contain a notice prescribed by the Federal Trade Commission rule

abrogating the holder in due course doctrine, 16 C.F.R. part 433. This required notice states:

> NOTICE   ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS
> SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD
> ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH
> THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL
> NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

57.     The loan documents did not contain the required notice.

58.     It is the standard practice of  Defendants Med-Den Funding, LLC and Security First

Bank to omit the notice from loan documents involving the financing of medical and dental

procedures.

59.     Instead, the loan documents stated the opposite:

CANCELLATION.  If I choose to cancel the underlying service for which I obtained this
loan, in whole or in part, I must contact my provider office to cancel the service ("Notice of
Cancellation").  Upon Notice of Cancellation, all or a portion of the loan amount that was
paid to my provider will be refunded to Lender, which will apply that amount to the
principal balance of this loan.  To the extent a principal balance remains outstanding on the
Note, due to service rendered prior to Notice of Cancellation or other reasons, the new
outstanding loan balance may be re-amortized and my repayment amount adjusted
accordingly. In the event of cancellation, Lender will retain any prior payments made on the
loan and I will be responsible for any remaining loan balance, unless the total amount of my
prior payments exceeds the total amount I owed upon Notice of Cancellation.  In that case,
Lender will refund any excess amount.

60.     This purports to authorize the provider to decide whether any refund will be made

or claim honored, which is directly contrary to 16 C.F.R. part 433.

61.     The same statement is made on the ProceedFinance website (Exhibit F).

62.     Plaintiff received two of five treatments.

63.     The treatments provided no benefits to Plaintiff,  and instead caused Plaintiff severe

shoulder pain. The pain was so severe it kept Plaintiff up at night, and she had to start wearing an

arm sling. Plaintiff had never experienced should pain that severe prior to the treatments.

64.     Plaintiff reported the pain to QC Kinetix, who tried to talk her into continuing the "treatments," and suggesting that stopping the treatments would put her back on the "hamster wheel of temporary treatments and to "living with the chronic pain." Plaintiff refused further treatments due to the extreme pain they were causing, cancelled further treatments, and informed the lender of her decision.

65.     At the time, Plaintiff had made several payments on her loan, by ACH debits from her Indiana bank account.

66.     Regenerative Health of Champaign, LLC offered a refund of only $9,000, after initially offering only smaller amounts. (Exhibit G).

67.     A company which offers treatments based on non-FDA-approved use of drugs is obligated to disclose this fact in all advertising. *Simeon Mgmt. Corp. v. FTC,* 579 F.2d 1137 (9th Cir. 1978); *FTC v. Pacific Medical Clinics Management., Inc.,* 90cv1277, 1992 U.S.Dist. LEXIS 6247 (S.D.Cal. April 10, 1992).

68.     Other consumers have complained of being similarly defraued and harmed by QC Kinetix's "treatments."

https://www.bbb.org/us/fl/ocala/profile/pain-management-clinics/qc-kinetix-0733-90766088/customer-reviews

        A.  Matt C., 11/5/23: At my consultation, Kimberly briefly went over my paperwork and gave me a physical. She didn't look at the images I brought, just the written notes. My 1st round of injections HURT. I was shaking from all the adrenaline. My 2nd round was with Dr. Ray Teznor. He was confused about where to inject and bit the hypodermic needle caps off with his mouth. Both my knees swelled up to over twice their size. I could barely walk. I developed a fever and chills. I was in EXCRUCIATING pain. I went to the ER. They found no infection and normal blood cell counts. The swelling, fever and chills persisted for days, so I called QC and spoke with Delica. She advised me to get a test that day to ensure there were no blood clots in my leg. I went back to the ER. Results were negative. Kimberly and Delica later drained 50 CCs of fluid from my knee. Kimberly told me the Columbus clinic called other clinics because they'd never experienced anything like this. They stated this sort of thing can happen and I shouldn't be alarmed. An MRI found a lateral femoral edema in my left knee from all the trauma. Up until being treated at QC, I only had

issues with the medial side of my left knee, not my lateral side and had NO edema. I canceled treatment since it was dangerous. I asked the remainder of my deposit be refunded. Kimberly left a voicemail explaining that I was in no danger and that it was safe for me to continue treatment. I finally received a call from Dennis, the owner. He also wanted me to continue treatment. I declined. He said he would refund ¾ of my money and would email some paperwork, including an NDA/release of liability. I asked why this paperwork was necessary for the refund. He said it was about reputation management and to please not review QC poorly online. He processed the refund without me signing. He expressed it would not be fair to leave a review because my situation "was so unique - we haven't experienced that at all," countering a lot of QC's previous statements.

      B.   Steven B. 11/1/23: First of all, be aware that this is a franchise just like McDonald's or Taco Bell. The owner doesn't have to have any medical training or certification. To my knowledge, all medical professionals are contractors and not employees. That explains why I was treated by several different people over the 6 months of treatments. This is a treatment that may or may not work. No doctor exam, no x-ray, no medical exam of any kind. In fact, the only initial contact is with a salesperson to close the deal and get you to start treatments immediately that visit. The treatment failed miserably for my hip. I still had to have replacement surgery after 6 months of treatment and increased pain as my hip joint was beyond repair. My orthopedic surgeon said that the femoral ball had totally collapsed and the blood flow had stopped months ago. I should have been more suspicious when I never saw a doctor, but I was in constant pain and desperate for relief that I would have agreed to any promises of pain relief. I have asked for a full or partial refund, but I am being ignored and unable to speak to anyone with authority to negotiate an acceptable settlement of the $8000 fee. Do not under any circumstances agree to the useless treatments. Save time and money and get a proper orthopedic surgeon to solve your problems. I suffered for 6 months when I could have gotten immediate relief from hip replacement. I'm currently 3 weeks post surgery and I'm pain free and back to normal. Please be sure to check online and read all of the reviews you can find for QC KINETICS so you can make a better, more informed decision than I did. Pain and desperation clouded my judgement and I made a huge mistake. Hopefully I can save at least one person from suffering and paying a fantastic price for absolutely nothing.

      C.    Jacqueline C.  10/27/23:  After trying many different avenues to treat my chronic neck, shoulders, and lower back pain, including chiropractic, physical therapy, massage, and acupuncture, I finally decided to try QC Kinetics. At the first visit, a salesman explained how regenerative stem cells (RSC) from your own blood are reinjected into the affected areas to begin regrowth of new anti-inflammatory cells. There was no physical exam, no x-rays, no medical questionnaire (just a few questions about pain), and they take NO medical insurance! After about 15-20 minutes of discussion, he tells me I have Sacroiliac Joint Dysfunction (SJD), and we can start treatments right away. After more than 20 years of pain and other treatments, I dove in. I bought it all- hook, line, and sinker! The phlebotomist (Mary) and technician (Kristen) are highly skilled and very pleasant to work with, but seven months and over 100 injections later, I am still relying only on Tylenol, Aspercreme, Salonpas, and Flexeril, since I was told to avoid ibuprofen and Voltaren. By the third and fourth appointments, I was questioning the effectiveness of treatment. I also noticed things in the office that did not seem very "clinical." They don't offer gowns, so one is in various stages of undress during treatment. There is no "sanitary, protection paper" on the exam tables. There is NOT an actual medical doctor on staff, only admin and clinical staff. Of course when I called QC to discuss the in-effectiveness of treatment, they said it was in my contract: The treatment

is not guaranteed to work on everyone. I am flabbergasted! I am livid! Now, I am $14k in debt to them, and still have no pain relief! They should offer a money-back-guarantee if they are charging THOUSANDS for uncertain treatment, or at least a partial refund if treatment does NOT work for you. I could have bought tons of massages or cases of Aspercreme and Salonpas! This place is a rip-off! Don't gamble on QC Kinetics: No Guarantees and NO REFUNDS!

   D. Claudia R. 5/20/23: THEY ARE SCAM ARTISTS, TAKE YOUR MONEY, FALSE PROMISES, I AM LOOKING FOR A LAWYER THAT WILL TAKE MY CASE PRO BONO......I AM IN WORSE PAIN THEN WHEN I STARTED THIS BULL **** [word omitted] TREATMENT. DON'T WASTE YOUR MONEY, I NEED MY MONEY BACK FOR OUT OF POCKET EXPENSES FOR HIP REPLEACMENT BECAUSE OF ALL THE LIES THEY TOLD ME......THEY CAN GO TO H*** (word omitted), I NEE HELP.....

## COUNT I  – ILLINOIS CONSUMER FRAUD ACT

69. Plaintiff incorporates paragraphs 1-68.

70. This claim is against QC Franchise Group LLC, doing business as QC Kinetix and Regenerative Health of Champaign, LLC, doing business as QC Kinetix - Champaign.

71. Defendants engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, by:

   a. Advertising a costly course of treatment based on non-FDA-approved use of drugs;

   b. Without clear and conspicuous disclosure of that fact in all advertising, including the QC Franchise Group LLC website; and

   c. Arranging for financing at a high rate of interest to pay for the treatment.

## CLASS ALLEGATIONS

72. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

73. The class consists of all individuals who contracted for treatment with a QC Franchise Group LLC franchisee in Illinois.

74. Plaintiff may alter the class definition to conform to developments in the case and

discovery.

75.    On information and belief, there are more than 100 members of the class, who are so numerous that joinder of all members is not practicable.

76.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

       a.    Whether Defendants fail timely disclose, in advertising, that they are offering a course of treatment based on uses of drugs not authorized by the FDA;

       b.    Whether such conduct is unfair and deceptive;

       c.    The appropriate relief.

77.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

78.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

79.    A class action is superior for the fair and efficient adjudication of this matter, in that:

       a.    Individual actions are not economically feasible.

       b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

       i.    Actual damages;

       ii.    Punitive damages;

       iii.    Injunctive relief;

       iv.    Attorney's fees, litigation expenses and costs of suit;

14

v.      Such other and further relief as the Court deems proper.

### COUNT II  – ILLINOIS CONSUMER FRAUD ACT

80.      Plaintiff incorporates paragraphs 1-68.

81.      This claim is against QC Franchise Group LLC, doing business as QC Kinetix and Regenerative Health of Champaign, LLC, doing business as QC Kinetix - Champaign.

82.      Defendants engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, by accepting money for payment for treatment pursuant to financing contracts which did not contain the notice required by 16 C.F.R. part 433.

### CLASS ALLEGATIONS

83.      Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

84.      The class consists of all individuals who contracted for treatment with a QC Franchise Group LLC franchisee in Illinois and received financing provided or arranged by Med-Den Funding, LLC, doing business as Proceed Finance and/or  Security First Bank.

85.      Plaintiff may alter the class definition to conform to developments in the case and discovery.

86.      On information and belief, there are more than 100 members of the  class, who are so numerous that joinder of all members is not practicable.

87.      There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a.      Whether Defendants accept money for payment for treatment pursuant to financing contracts which did not contain the notice required by 16 C.F.R.

part 433.

b.    Whether such practice is unfair and deceptive;

c.    The appropriate relief.

88.    Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

89.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

90.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.    Actual damages;

ii.    Punitive damages;

iii.    Injunctive relief;

iv.    Attorney's fees, litigation expenses and costs of suit;

v.    Such other and further relief as the Court deems proper.

## COUNT III  – ILLINOIS CONSUMER FRAUD ACT

91.    Plaintiff incorporates paragraphs 1-68.

92.    This claim is against Med-Den Funding, LLC, doing business as Proceed Finance and  Security First Bank.

93.    Defendants engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, by having consumers who had financing arranged with Defendants by a provider of

16

health care goods and services sign financing documents that did not include the statement required by 16 C.F.R. part 433.

## CLASS ALLEGATIONS

94.     Plaintiff brings this claim on behalf of a class and subclass, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

95.     The class consists of all individuals who had financing arranged with Defendants by a provider of health care goods and services where the financing documents did not include the statement required by 16 C.F.R. part 433, if either the provider's address or the individual's address was in Illinois. The subclass consists of class members whose provider was a QC Franchise Group LLC franchisee in Illinois.

96.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

97.     On information and belief, there are more than 100 members of the  class and subclass, who are so numerous that joinder of all members is not practicable.

98.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

> a.      Whether Defendants omit the statement required by 16 C.F.R. part 433 in advertising;
>
> b.      Whether such conduct is unfair and deceptive;
>
> c.      The appropriate relief.

99.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

100.    Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and consumer litigation.

101.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.    Actual damages;

ii.    Punitive damages;

iii.    Injunctive relief;

iv.    Attorney's fees, litigation expenses and costs of suit;

v.    Such other and further relief as the Court deems proper.

## COUNT IV  – NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT

102.    Plaintiff incorporates paragraphs 1-68.

103.    This claim is against Med-Den Funding, LLC, doing business as Proceed Finance and  Security First Bank.

104.    Rev. Stats. Nebr. §87-304(c) provides that the state's Uniform Deceptive Trade Practices Act applies to "deceptive trade practices conducted in whole or in part within the State of Nebraska against residents or nonresidents of this state. . . ."

105.    Rev. Stats. Nebr. §87-302(a) provides that "A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she: . . . (16) Uses any scheme or device to defraud by means of:  (i) Obtaining money or property by knowingly false or fraudulent pretenses, representations, or promises; . . . .

18

106.     Rev. Stats. Nebr. § 87-303.01 provides that "An unconscionable act or practice by a supplier in connection with a consumer transaction shall be a violation of the  Uniform Deceptive Trade Practices Act."

107.     Rev. Stats. Nebr. § 87-303(a) provides that "A person likely to be damaged by a deceptive trade practice of another may bring an action for, and the court may grant, an injunction under the principles of equity against the person committing the deceptive trade practice. The court may order such additional equitable relief as it deems necessary to protect the public from further violations, including temporary and permanent injunctive relief. Proof of monetary damage, loss of profits, or intent to deceive is not required. . . ."

108.     Rev. Stats. Nebr. § 87-303(b) allows attorneys fees where "the party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive."

109.     Rev. Stats. Nebr. § 87-303.10 provides that "A civil action arising under the Uniform Deceptive Trade Practices Act may be brought only within four years from the date of the purchase of goods or services."

110.     Defendants engaged in deceptive and unconscionable acts and practices by having consumers who had financing arranged with Defendants by a provider of health care goods and services sign financing documents that did not include the statement required by 16 C.F.R. part 433. The use of such documents is intended to result and did result in obtaining money or property by knowingly false or fraudulent pretenses, representations, or promises," namely, that the consumer had to repay the loan unless the medical provider agreed to a refund.

## CLASS ALLEGATIONS

111.     Plaintiff brings this claim on behalf of a class and subclass, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

19

112.    The class consists of all individuals who had financing arranged with Defendants by a provider of health care goods and services where the financing documents did not include the statement required by 16 C.F.R. part 433 and such documents are dated on or after a date four years prior to the filing of this action.  The subclass consists of class members whose provider was a QC Franchise Group LLC outlet or franchisee.

113.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

114.    On information and belief, there are more than 100 members of the class and subclass, who are so numerous that joinder of all members is not practicable.

115.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

> a.    Whether Defendants omit the statement required by 16 C.F.R. part 433 in advertising;
>
> b.    Whether such conduct is deceptive or unconscionable;
>
> c.    Whether such omission is likely to cause injury to consumers who have signed financing documents with Defendants;
>
> d.    Whether Defendants' conduct was wilful;
>
> e.    The appropriate relief.

116.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

117.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

118.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.    Actual damages;

    ii.    Injunctive relief, including an order requiring the inclusion of the notice required by 16 C.F.R. part 433 in all outstanding and future loan agreements, and notifying borrowers of such inclusion;

    iii.    Attorney's fees, litigation expenses and costs of suit;

    iv.    Such other and further relief as the Court deems proper.

## COUNT V – RICO

119.    Plaintiff incorporates paragraphs 1-68.

120.    This claim is against Med-Den Funding, LLC, doing business as Proceed Finance, and Security First Bank, the RICO "persons."

121.    Med-Den Funding, LLC doing business as Proceed Finance and Security First Bank formed an association in fact enterprise for the purpose of originating, servicing and collecting loans financing medical and dental treatments.

122.    The enterprise:

    a.    Was formed in 2018 or earlier,

    b.    Was memorialized in a series of written agreements, described in the Affidavit of Brent Corbin (Exhibit B) but not available to Plaintiff;

    c.    Has continued until the present.

123.    The above enterprise engaged in interstate commerce, in that both Med-Den Funding, LLC doing business as Proceed Finance and Security First Bank are located in Nebraska and are financing transactions in other states.

124.    Med-Den Funding, LLC doing business as Proceed Finance, and Security First Bank each violated 18 U.S.C. §1962(c), in that, while associated with the enterprise in fact described above, they conducted or participated in the conduct of such enterprise's affairs through a pattern of wire fraud, as defined in 18 U.S.C. §1343.

125.    The fraud consisted of:

a.    Representing to numerous consumers that any  cancellation of their loans had to be initiated through the medical provider, when they were required to state the opposite under 16 C.F.R. part 433;

b.    Defendants' practice of funding loans for medical and dental treatment immediately upon execution of loan documents, prior to the completion of treatment, and

c.    Financing of novel or unapproved treatments, such as those provided to Plaintiff.

126.    Defendants knew that there was a high likelihood that patients would cancel treatment or have claims and defenses against medical providers, and engaged in a scheme to obtain and keep the patients' money regardless.

127.    18 U.S.C. §1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

128.    18 U.S.C. §1343 provides:

22

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. . . .  If the violation . . . affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

129.   Numerous interstate wire communications were used in connection with

the fraud complained of, in that:

    a.    Applications for loans are made by use of interstate wire communications, such as emails from cell phones and computers located in states other than Nebraska.

    b.    Execution of loan documents is effected by use of interstate wire communications, such as emails to cell phones and computers located in states other than Nebraska.

    c.    Approval of loans is preceded by obtaining credit reports via interstate wire communications with credit bureaus.

    d.    Funding of the loans is effected by use of interstate wire communications, such as ACH credits to bank accounts located in states other than Nebraska.

    e.    Repayment of the loans is effected by use of interstate wire communications, such as ACH debits from bank accounts located in states other than Nebraska.

130.   Examples of other loan agreements omitting the notice required by 16 C.F.R. part

433 and misrepresenting that the provider had to approve any cancellation are in Exhibit H.

23

## CLASS ALLEGATIONS

131.    Plaintiff brings this claim on behalf of a class and subclass, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

132.    The class consists of all individuals who had financing arranged with Defendants by a provider of health care goods and services without including in the financing documents the statement required by 16 C.F.R. part 433.  The subclass consists of class members whose provider was a QC Franchise Group LLC outlet or franchisee.

133.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

134.    On information and belief, there are more than 100 members of the class and subclass, who are so numerous that joinder of all members is not practicable.

135.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a.    Whether Defendants omit the statement required by 16 C.F.R. part 433 in loan documents and instead represents that any cancellation of the loan must be initiated through the provider;

b.    Whether such conduct is fraudulent;

c.    Whether interstate wire communications are used to effectuate the fraud or obtain its proceeds;

d.    The appropriate relief.

136.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

137.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and consumer litigation.

138.     A class action is superior for the fair and efficient adjudication of this matter, in that:

     a.     Individual actions are not economically feasible.

     b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

     i.     Actual damages;

     ii.     Treble damages;

     iii.     Attorney's fees, litigation expenses and costs of suit;

     iv.     Such other and further relief as the Court deems proper.


*/s/ Daniel A. Edelman*
Daniel A. Edelman


Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 62070473)
Dulijaza (Julie) Clark (ARDC 6273353)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

/s/ Daniel A. Edelman
Daniel A. Edelman

T:\40258\Pleading\Complaint 11-13-23_Pleading.WPD

Exhibits

A  Example of a Med-Den / provider agreement

B  Affidavit of Brent Corbin

C  Documents given to Plaintiff describing the treatments

D  Documents given to Plaintiff at the end of the first session.

E  Plaintiff's loan agreement.

F  Material from ProceedFinance website

G  Email from Regenerative Health of Champaign, LLC to Plaintiff

H  Collection of other loan agreements

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

<u>*/s/ Daniel A. Edelman*</u>
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
       & GOODWIN, LLC
20 S. Clark Street, Suite 1500
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)