# **EXHIBIT A**

## SERVICE AGREEMENT

THIS SERVICE AGREEMENT (together with all exhibits hereto, this "Agreement") is effective as of _____5/29_____, 2019 (the "Effective Date") between:

MED-DEN FUNDING, LLC, a Nebraska limited liability company, doing business as "Proceed Finance" ("Contractor")

and

B. Grigorovich DDS Inc ("Provider").

Contractor and Provider are hereinafter sometimes individually referred to herein as a "party" and collectively as the "parties".

## RECITALS

WHEREAS, Contractor has developed a program whereby certain third party financial institutions ("Lenders") may originate, fund and service unsecured personal loans ("Loans") to Borrowers to finance the purchase of Services from certain providers (the "Program");

WHEREAS, Contractor is authorized to administer and act on behalf of the Lenders in connection with Loans to Borrowers and to assist in the origination of Loans for the benefit of Lenders and the Providers; and

WHEREAS, Provider provides Services to its Patients and desires the ability to participate in the Program on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### ARTICLE I – CERTAIN DEFINED TERMS

When used in this Agreement, the following capitalized terms shall have the following meanings:

1. "Application" shall mean the on-line application submitted by Patient or Borrower to Lender via the Portal in order to apply for a Loan.

2. "Borrower" shall mean any individual submitting or cosigning an Application on behalf of a Patient (including Patient, if appropriate) who qualifies for and ultimately receives a Loan in the Financed Amount pursuant to the terms and conditions of the Loan Documents.

3. "Contractor Payment" shall mean the portion of the Financed Amount calculated in accordance with the terms of Exhibit A, paid to Contractor by the Provider in accordance with the provisions in Article II, Section 7 in exchange for Contractor's arrangement of the Loan

from Lender and oversight of the Third Party Servicer, and the warranties enumerated in this Agreement.

4. "Financed Amount" shall mean the amount of any Loan funded by Lender on behalf of Borrower to Provider hereunder for full or partial payment for the Services received by Patient or Borrower.

5. "Financial Information" shall mean all consumer financial information relevant to the determination by Lender of whether to make a Loan to a Borrower for the Financed Amount, whether relating to the financial condition of the Patient or the Borrower.

6. "Law" shall mean any statute, act, code, law, rule, regulation, order, license, permit, ordinance, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretive or advisory opinion or letter of any governmental department, commission, board, bureau, agency, court or other instrumentality of any country, state, province, county, parish, municipality, jurisdiction or other political subdivision thereof.

7. "Loan Documents" shall mean the documents, agreements and instruments entered into between the Lender and Borrower for any Loan of a Financed Amount.

8. "Loan Payment" shall mean any payment by a Borrower in repayment of the Financed Amount to Lender pursuant to the terms and conditions of the Loan Documents, inclusive of principal, interest and any associated fees, charges or indemnities related thereto.

9. "Patient" shall mean the individual to whom Services are provided by Provider.

10. "Patient Down Payment" shall mean the amount (if any) paid directly to Provider by Patient, Borrower, or other third party, for the Services, which amount is not part of the Financed Amount.

11. "Provider Payment" shall mean the amount of the Financed Amount minus the Contractor Payment.

12. "Third Party Servicer" shall mean the third party engaged by Contractor and Lender to service all Loans made by Lender to Borrowers hereunder.

13. "Services" shall mean solely those goods, services, treatments or procedures provided by Provider to Patients in the ordinary course of Provider's business that are the subject of any Loan.

All other capitalized terms shall have the meaning provided to such terms elsewhere in this Agreement.

### ARTICLE II – DUTIES OF THE PARTIES; TRAINING PROGRAM

1. Contractor Duties. Contractor shall make available Lender's approved web-enabled loan application tool and associated system for collecting and processing Loan requests (the "Portal") to Patients who wish to complete an Application. Contractor shall also arrange for and coordinate with Third Party Servicer to handle collections of any Loans, including

customer service for both the proper completion of an Application and Loan servicing. Contractor shall, at all times hereunder, perform such services and duties in good faith, in a commercially reasonable manner and in accordance with applicable Law.

2. Training Program. Prior to any Application by a Borrower being submitted to Lender (and as otherwise required or deemed necessary by Contractor or Lender from time to time thereafter), Contractor shall provide one or more training programs (a "Training Program") to Provider, its employees, agents and representatives (the "Provider Staff") who are or are reasonably expected to use the Portal or otherwise communicate or make available information about the Program to Patients. The Training Program will be in the form of an in-person or web-based interactive session and demonstration with materials, including the Contractor's current user manual for the Portal (as the same may be updated from time to time, the "User Manual"). The Training Program will be used to educate and train the Provider Staff on how to support the appropriate use and functionality of the Portal as detailed in the User Manual (the "Approved Procedures"). Upon any modification or update to the User Manual, Contractor shall provide reasonable advance notice and an updated User Manual and/or training session(s) to Provider's Staff as reasonably required to implement the modified process. Any such additional training session(s) will be scheduled and held in coordination with Provider and the applicable Provider Staff. Before Provider Staff will be permitted under the terms of this Agreement to communicate or make available information about the Portal to a prospective Borrower or assist a prospective Borrower in completing and submitting an Application, such Provider Staff must have completed the most current Training Program and must, in Contractor's sole discretion, demonstrate an appropriate understanding of the Approved Procedures.

3. Provider Duties. At all times hereunder, Provider shall, and shall cause its Provider Staff to (i) participate in and complete the Training Program(s) provided by Contractor, (ii) as may be requested by a prospective Borrower, provide ministerial aid in connection with properly completing an Application, (iii) comply with the Approved Procedures (as the same may be changed from time to time by Contractor upon thirty (30) days' advance written notice to Provider), and (iv) notify Contractor and Lender, within five (5) days, of any refund agreements with Patient or Borrower and the terms of such refund or any refund request or cancellation of Services by a Patient. Provider shall, at all times hereunder, perform such services and duties in good faith, in a commercially reasonable manner and in accordance with applicable Law.

4. Underwriting and Lending Decisions. Notwithstanding anything to the contrary contained elsewhere herein, it is expressly understood and agreed that (i) the underwriting standards for any Loans made under the Program shall be in the sole and absolute discretion of Lender, (ii) nothing contained herein obligates either Lender to accept any Application or make any Loans or Contractor to coordinate the making of any Loans or to continue the Program, and (iii) the terms and conditions of any Loan offered to a prospective Borrower shall be in the sole and absolute discretion of Lender and subject to appropriate Loan Documents between Lender and Borrower.

5. Servicing. Third Party Servicer will be responsible for collections and servicing of all Loans under the Program. Provider is not authorized to receive or retain any Loan Payments from a Borrower. In the event a Borrower erroneously sends a Loan Payment to Provider, Provider

agrees it shall not accept the payment, and, if received, will instead promptly return the payment to Borrower in the form received and instruct Borrower to forward the payment to Third Party Servicer for the benefit of Lender, as directed by Contractor.

6. Down Payment. Any Patient Down Payment will be made by Patent directly to the Provider. Contractor shall have no responsibility, obligation, duty, or liability related to or arising out of the Patient Down Payment.

7. Processes and Procedures. The parties shall follow the processes and procedures set forth on Exhibit B hereto with respect to each Application and Loan under the Program. The parties agree to execute and deliver any documents, agreements, instruments, instructions, or otherwise, that are reasonably necessary to permit and enable Lender to perform the procedures and transfer the monies in accordance with the processes set forth in Exhibit B. Provider hereby authorizes Lender to withdraw from Provider's Account, via Automated Clearing House ("ACH") transfer, the Contractor Payment and to transfer the Contractor Payment to an account designated by Contractor. In the event any monies are erroneously deposited or transferred to a party or its account other than in accordance with the procedures described in Exhibit B, the party in receipt of such funds in error will, within three (3) business days, transfer such funds to the account of the appropriate party.

8. Timing of Funding. Provider acknowledges and understands that Lender will not fund a Loan more than sixty (60) days prior to the date a Patient is scheduled to receive the Services which are the subject of the Loan.

**ARTICLE III – REFUNDS AND CANCELLATIONS**

1. Provider Refund for Substandard or Noncompliant Services. If, after Services are commenced, Provider reasonably determines, in accordance with its policy for refunding substandard, faulty or improper Services, that a full or partial refund of the cost of the Services is warranted and necessitated, Provider shall promptly notify Contractor, and, within three (3) business days of the determination to process a refund, shall refund the entire outstanding Financed Amount to Lender (or in the case of a partial refund, the amount of the outstanding Financed Amount in proportion to the amount refunded). Lender shall be entitled to retain any prior payments made by Patient associated with such Loan. In the event that the refund exceeds the total sum of the Financed Amount, any additional refund shall be paid to Patient or Borrower by Provider from the Provider Down Payment.

2. Cancellations within 30 Days of Funding. If, on or before thirty (30) days of the disbursement to Provider of the Financed Amount and prior to the commencement of the Services, a Patient elects to cancel the Services, Provider shall promptly notify Contractor of same and shall (A) refund (i) the Provider Payment to Lender and (ii) any Patient Down Payment to the Patient, and (B) Contractor shall refund the Contractor Payment to Lender.

3. Cancellations after 30 Days of Funding. If, after thirty (30) days of the disbursement to Provider of the Financed Amount and prior to the commencement of the Services, a Patient elects to cancel the Services, (A) Provider shall promptly notify Contractor of same and shall refund (i) the entire Provider Payment, plus the Contractor Retained Amount to Lender, and (ii) any Patient Down Payment to the Patient, (B) Contractor shall refund the Contractor Payment to Lender (less

$1,000 (the "Contractor Retained Amount")), and (C) Lender shall be entitled to retain any prior payments made by Patient associated with such Loan.

4. Refund Processing via ACH. Any refunds permitted under this Article III will be processed promptly and electronically by ACH transfer to the account of the applicable payee consistent with this Article III. In furtherance of the foregoing, upon receipt of notice of a refund, Provider and Contractor each hereby authorize Lender to process refunds via ACH transfer from their respective bank account(s) to the appropriate payee and agree to deliver such documents, instruments or instructions to Lender or a third party (including Third Party Servicer), or as may be reasonably requested by Lender, Contractor or a third party (including Third Party Servicer), in order to accomplish the foregoing.

5. Prepayments. Notwithstanding the foregoing, in the event that, after the disbursement to Provider of the Financed Amount, a Patient still elects to move forward with the Services but decides to instead pay for all or a portion of the Services in some other manner (e.g., with cash or other credit), (i) no refund of the Financed Amount will be permitted and such payment by the Patient will instead be treated as a prepayment of the Financed Amount (which shall include all accrued but unpaid interest of the applicable portion of the Financed Amount through the date of prepayment), (ii) Contractor shall be entitled to retain the Contractor Payment, and (iii) Lender shall be entitled to retain any prior payments made by Patient under the Loan. Consistent with Section 7 of Article II above, Provider shall not be entitled to receive any such prepayment from Patient or Borrower but shall instead direct the Patient or Borrower to remit the prepayment to Lender or Third Party Servicer in accordance with the Loan Documents.

6. For any given Loan under the Program, under no circumstances shall Contractor be responsible or liable to Provider, Patient or Borrower or any other third party, for any refund amount exceeding the Contractor Payment.

**ARTICLE IV – MUTUAL REPRESENTATIONS AND WARRANTIES.** Each party hereby represents, warrants and covenants to the other parties as of the date of funding of any Financed Amount hereunder as follows:

1. Such party is duly organized, validly existing, and in good standing under the laws of the state of its organization and conducts its business in compliance with applicable Law.

2. Such party has all requisite power and authority to carry on its business as presently conducted, to enter into this Agreement and to perform its obligations under this Agreement. The consummation of the transactions contemplated by this Agreement will not violate, nor be in conflict with, any provision of such party's governing documents, or any agreement, contract, understanding (whether written or verbal) or other instrument or document to which such party is bound, or any judgment, decree, order, statute, rule or regulation applicable to such party.

3. This Agreement constitutes the legal, valid and binding obligation of such party enforceable in accordance with its terms, subject, however, to the effects of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect, as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**ARTICLE V – PROVIDER REPRESENTATIONS, WARRANTIES AND COVENANTS.** Provider hereby represents, warrants and covenants to Contractor as of the date of funding of any Financed Amount hereunder as follows:

1. All persons who provide, or participate in the provision of, the Services are qualified to do so under applicable Law. All equipment used by Provider in the provision of the Services is approved and permitted by applicable Law. There are no pending or past criminal charges against any person that in any way relate to the provision of the Services. The Services will be fit and merchantable for their intended purpose (if applicable) and have been performed in accordance with customary industry standards. Provider is the sole provider of any Services that are the subject of any Loan under the Program.

2. Provider and Provider's Staff will at all times comply with the Approved Procedures. Provider and Provider's Staff will use commercially reasonable efforts to ensure (i) the accuracy and completeness of all information, documents, statements, consents, and other information obtained or prepared by Provider and submitted in an Application and (ii) that all such information is not misleading or fraudulent.

3. Each signatory to an Application or Loan Document is of legal age, and competent to contract at the time of execution thereof and is not under any duress (including, without limitation, such person being under sedation, extreme discomfort or heavily medicated).

4. Provider has not increased the purchase price or cost of financing for the Services financed by Lender pursuant to the Program or taken any other adverse action against a Patient or prospective Borrower because they are either a member of a protected class (as defined by applicable Law) or because they have chosen to use the Program to finance the payment for the Services.

5. All Provider Staff have completed the Training Program.

6. Provider and Provider's Staff will only use documents and materials (including the Portal) provided by Contractor in connection with the Program. Provider and Provider's Staff will only use the Portal in accordance with the Approved Procedures.

7. Provider shall not discourage Applications for credit or otherwise discriminate on the basis of the Patient's or Borrower's, or prospective Patient's or Borrower's, age, race, religion, gender, sexual classification or membership in any other protected class.

8. Upon the request of Contractor, Provider shall promptly deliver evidence, in a reasonable form satisfactory to Contractor, of compliance with applicable Law, including, but not limited to, copies of any notice or disclosure form furnished to Patients or Borrowers.

9. Provider shall maintain a complete set of records of all business activities conducted by Provider pursuant to this Agreement. Contractor and its duly authorized employees, agents, or representatives, and federal and state regulatory agencies which supervise Contractor or Lender, shall have a right, upon reasonable notice, to audit, inspect and copy any of the

6

foregoing records, reports, files, claims and complaints and related materials of the Provider and Provider shall cooperate and assist in any such audit or inspection.

## ARTICLE VI - INDEMNIFICATION

Provider shall reimburse, indemnify, defend and hold harmless Contractor and its affiliates and each of their respective directors, officers, stockholders, members, partners, owners, managers, employees, agents, attorneys and representatives from and against any and all claims, losses, suits, proceedings, investigations, demands, assessments, causes of action, fines, penalties, refunds, liabilities, obligations or damages and reasonable attorneys' fees and expenses and court costs (collectively, "Damages") incurred or suffered by such indemnified party arising from, related to, caused by or otherwise resulting from (i) the fraud, gross negligence or willful misconduct or omissions of Provider or Provider's Staff; (ii) the breach of Provider's representations, warranties, covenants, agreements or obligations hereunder; (iii) the falsification of information by Provider or Provider's Staff; (iv) unauthorized advertising of Contractor's services, (v) the infringement or misappropriation of Contractor's or Lender's intellectual property or other proprietary rights by Provider or Provider's Staff, (vi) personal injury, medical malpractice or other claim resulting from Provider's or Provider Staff's performance of the Services, (vii) personal injury or property damage caused by Provider's or Provider Staff's performance of Services or its obligations hereunder and (viii) the failure or delay of Provider to refund (or cause to be refunded) monies in accordance with Article III.

## ARTICLE VII – MISCELLANEOUS PROVISIONS

1. Termination: Suspension. Either party may terminate this Agreement on thirty (30) days prior written notice to the other party. This Agreement may also be terminated under the following circumstances:

   a. Any voluntary or involuntary bankruptcy or insolvency by a party shall be considered an immediate termination event and shall result in the immediate termination of this Agreement.

   b. If a regulatory agency determines, or if a party reasonably believes that, the services provided by a party hereto do not comply with applicable Law, any other party may suspend performance under this Agreement until such non-compliance has been remedied to the reasonable satisfaction of the suspending party or may immediately terminate this Agreement upon written notice to the other party.

2. Effect of Termination. Notwithstanding termination of this Agreement by any party, (i) the provisions of this Agreement will continue in force as to all Loans made prior to the effective date of termination (including, without limitation, with respect to cancellations or refunds), and (ii) the representations, warranties, covenants and agreements (including, without limitation, indemnification obligations) of the parties shall remain in full force and effect. Upon termination of this Agreement, each party shall promptly return the Confidential Information of each other party, or shall promptly destroy any material containing such Confidential Information (and any copies or extracts thereof).

3. Confidential Information: Intellectual Property: Publicity.

a. Any party (the "Disclosing Party") may provide any other party (the "Receiving Party") with certain confidential and proprietary information by any method and in any form or format, related to the business of the Disclosing Party, whether or not such information or materials are marked "Confidential," "Restricted," "Proprietary" or with other similar marking ("Confidential Information"). Confidential Information includes, but is not limited to, the User Manual, the Portal, software or other technology, product specifications and technical data, product designs/ideas, market/sales forecasts and information, proprietary materials, all business trade secrets, financial and accounting data, business plans, pricing information, policies and procedures, know-how and Nonpublic Personal Information. However, "Confidential Information" does not include information that: (i) is publicly known at the time of its disclosure; (ii) is lawfully received by the Receiving Party from a third party not under an obligation of confidentiality to the Disclosing Party; (iii) is published or otherwise made known to the public by the Disclosing Party; or (iv) was generated independently by the Receiving Party before disclosure by the Disclosing Party and without the use of any Confidential Information. "Nonpublic Personal Information" shall include all personally identifiable financial information and any list, description or other grouping of consumers or Patients or Borrowers, and publicly available information pertaining to them, that is derived using any personally identifiable financial information that is not publicly available, and shall further include all "nonpublic personal information" of any consumer or Patient or Borrower, as defined by the federal regulations implementing the Gramm-Leach-Bliley Act, as amended from time to time, and shall further include individual health-related information and "Protected Health Information" of a Patient or Borrower as defined by the Health Insurance and Portability Act, related federal regulations, and applicable Law. "Personal identifiable financial information" means all financial information and any additional information a consumer provides to a party in order to obtain a financial product or service, any information a party otherwise obtains about a consumer in connection with providing a financial product or service to that consumer, and any information about a consumer resulting from any transaction involving a financial product or service between a party and a consumer. Personally identifiable information may include, without limitation, a consumer's first and last name, physical address, zip code, email address, SSN, birth date and any other information that itself identifies or when tied to the above information may identify a consumer. For the avoidance of doubt, the parties agree that this Agreement does not require transfer of Protected Health Information.

b. The Receiving Party agrees that during the term hereof and for so long as it has such Confidential Information in its possession: (i) it will hold the Confidential Information of the Disclosing Party in the strictest confidence, (ii) it will exercise no less care with respect to the Disclosing Party's Confidential Information than the level of care exercised with respect to its own Confidential Information, but in no event less than reasonable care, and (iii) upon the request of the Disclosing Party, promptly return to the Disclosing Party or destroy all copies of the Disclosing Party's Confidential Information.

c. The Receiving Party shall not use the Disclosing Party's Confidential Information for any purpose other than for the purpose of performance under this Agreement. The Receiving Party may only disclose the Disclosing Party's Confidential Information to the Receiving Party's officers, directors, key employees and financial and legal advisors who have the need to know such Confidential Information and in order for the Receiving Party to

8

perform its obligations under this Agreement. Before any disclosure, such persons must be informed of and will agree to be bound by the provisions of this Section, and the Receiving Party will remain responsible for any unauthorized use or disclosure of the Disclosing Party's Confidential Information by any of them. The Receiving Party may also disclose the Disclosing Party's Confidential Information pursuant to the requirement or request of a governmental agency, a court or administrative subpoena or an order or other legal process or requirement of law so long as it shall: (i) first notify the Disclosing Party of such request or requirement unless prohibited by applicable Law, (ii) in the case of a required disclosure, furnish only such portion of the Disclosing Party's Confidential Information as it is advised in writing by counsel that it is legally required to disclose, and (iii) cooperate with the Disclosing Party in its efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to that portion of the Disclosing Party's Confidential Information that is required to be disclosed.

d. All right, title, and interest in and to the technology, the Program, the Portal (including the underlying software associated therewith), the Training Program including the User Manual, and other intellectual property used to provide Contractor's services hereunder shall remain the sole and exclusive property of Contractor. Provider shall not, and shall not permit any other person or entity to, access or use the Portal except as expressly permitted by this Agreement and the applicable terms of use thereof. For purposes of clarity and without limiting the generality of the foregoing, Provider shall not, except as this Agreement expressly permits, (i) copy, modify or create derivative works or improvements of the Portal, or (ii) reverse engineer, disassemble, decompile, decode, adapt or otherwise attempt to derive or gain access to the source code of the Portal, in whole or in part.

e. Each Receiving Party understands and acknowledges that any disclosure or misappropriation of any of a Disclosing Party's Confidential Information in violation of this Agreement may cause the Disclosing Party irreparable harm, the amount of which may be difficult to ascertain and, therefore, agrees that the Disclosing Party shall have the right to apply to a court of competent jurisdiction for an order restraining any such further disclosure or misappropriation and for such other relief as the Disclosing Party shall deem appropriate. Such right of the Disclosing Party shall be in addition to the remedies otherwise available to the Disclosing Party at law or in equity.

f. If any incident or circumstance, including without limitation a breach of data security, results in an unauthorized disclosure of Confidential Information of a Disclosing Party, or results in a risk of such disclosure, the Receiving Party shall take appropriate measures to correct or stop the incident or situation, report on the incident or situation to the Disclosing Party as soon as possible after discovery of the incident or situation, subsequently report the corrective action taken by the Receiving Party in response to the incident or situation, and provide reasonable information and assistance to the Disclosing Party so that the Disclosing Party may implement the appropriate response, including any response measures required by applicable Law. The Receiving Party shall be responsible for reimbursing the Disclosing Party for any and all costs associated with any response measures required by applicable Law.

4. Survival Clause. In addition to any provision specifically identified as surviving termination, Article II, Section 6; Article III; Article VI; and Article VII Sections 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 19, 20 and 21 shall survive termination of this Agreement.

5. Notice. All notices required or permitted to be given hereunder shall be in writing and shall be considered given and received when (i) personally delivered to the party, (ii) delivered by email to the email address set forth below upon confirmed receipt thereof, or (iii) deposited in the United States mail, postage prepaid, return receipt requested, properly addressed to a party at the address set forth below, or at such other email address or mailing address as such party shall have specified by notice given in accordance with the provisions of this Section.

   CONTRACTOR:
   Med-Den Funding, LLC
   Attn: David Roehr
   4701 Innovation Drive, Suite 200
   Lincoln, NE 68521
   Email: dave@proceedfinance.com

   PROVIDER:
   B. Grigorovich DDS Inc       (name)
   3180 Willow Ln Ste 218       (address 1)
   Westlake Village, CA 91361   (address 1)
   grig@sbcglobal.net           (email address)

6. Insurance. At all times hereunder, each party shall maintain appropriate insurance coverage for their respective business and personnel, in type, amount and duration, based upon customary practice within such party's respective industry, and adequate in relation to the indemnification obligations under this Agreement.

7. Advertising. Provider shall not refer to Contractor or Lender or specific financing options unless given advance written approval by Contractor; provided however that such approval shall not be required if the communication referring to Contractor or Lender or financing options is a communication with its employees or agents and is not directed (or intended to be directed) toward a consumer audience.

8. Use of Name, Mark, and Logo. No party may use the name, mark, or logo of any other party without advance written approval of such party whose name, mark or logo is to be used. Each party's execution of this Agreement constitutes written approval to each other party hereto that they may use another party's name in connection with its performance under this Agreement.

9. Disclaimer of Warranties. Each party shall be solely responsible for the selection and use of telecommunications, internet access, and any other systems and services required to connect to, access or otherwise use the Portal or to otherwise engage in the Program provided hereunder, including, without limitation, computers, computer operating system and web browser (collectively, the "Equipment") and any charges associated therewith. No party shall have liability with respect to the inability of any other party or any Patient or Borrower to

access or use the Portal resulting from the Equipment needed to connect to, access or otherwise use Program. Contractor (or its third party partners and vendors) shall have the right to perform scheduled or emergency maintenance with respect to the Portal provided hereunder that may limit or suspend the availability of the services provided hereunder. CONTRACTOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY REGARDING THE AVAILABILITY, TIMELINESS, OR RESULTS TO BE DERIVED FROM THE USE OF THE PORTAL, THE PROGRAM, ANY OTHER SOFTWARE UTILIZED IN CONNECTION THEREWITH OR ANY SERVICES PROVIDED HEREUNDER. ALL SUCH PRODUCTS AND SERVICES PROVIDED HEREUNDER ARE PROVIDED TO PROVIDER ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF QUALITY, PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT, IN EACH CASE TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

10. Waiver of Consequential Damages. IN NO EVENT SHALL CONTRACTOR BE LIABLE TO PROVIDER, OR HAVE ANY LIABILITY, IN CONTRACT, TORT, OR OTHERWISE, FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL (INCLUDING LOSS OF BUSINESS, PROFITS OR DATA), OR PUNITIVE DAMAGES, ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE HEREOF, EVEN IF PROVIDER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

11. Force Majeure. No party nor its affiliates shall be responsible or have any liability for delays or performance failures caused from acts, conditions or circumstances beyond their reasonable control, including, but not limited to, wars, acts of government, natural disasters, acts of terrorism, acts of God, labor strike, cyber-attacks or viruses affecting the use or performance of technology, and only for so long as such act, condition or circumstance exists and remains outside the reasonable control of the party claiming force majeure.

12. Governing Law; Venue. This Agreement shall be construed in accordance with the laws of the State of Nebraska, without regard to its choice of law provisions. Any legal suit, action or proceeding arising out of this Agreement or the transactions contemplated hereby shall be instituted in the federal courts of the United States of America or the courts of the State of Nebraska in each case located in Lancaster County, Nebraska, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any party.

13. Severability. If any provisions of this Agreement, as applied to any party or to any circumstance, shall be adjudged by a court of competent jurisdiction to be void and unenforceable, the same shall in no way affect (i) any other provision in this Agreement, (ii) the application of such provision in any other circumstance, or (iii) the validity or enforceability of the Agreement as a whole.

14. Terms Confidential. The parties agree this Agreement and all the terms and conditions of this Agreement shall be treated as Confidential Information.

15. <u>Counterparts</u>. If applicable, this Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one Agreement. Such counterparts may be exchanged by means of electronic transmission.

16. <u>Costs and Expenses</u>. Each party shall bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated herein.

17. <u>Independent Contractors</u>. The parties are independent contractors of each other. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment, or fiduciary relationship among the parties. No party, by virtue of this Agreement, will have any right, power, or authority to act or create an obligation, express or implied, on behalf of any other party.

18. <u>Further Assurances</u>. The parties shall cooperate fully with each other and execute such further instruments, documents, and agreements, and shall give such further written assurances, as may be reasonably requested by another party to better evidence and reflect the transactions described herein and contemplated hereby, and to carry into effect the intent and purposes of this Agreement.

19. <u>Cumulative Remedies</u>. The remedies of the parties hereunder are cumulative and in addition to all rights and remedies at law and in equity.

20. <u>Entire Agreement; Amendment; No Waiver; Assignment</u>. This Agreement, including all exhibits attached hereto and incorporated herein by this reference, is the entire and exclusive statement of the agreement between the parties, and supersedes and merges all prior proposals, understandings and all other agreements, oral and written, between the parties relating to the subject matter hereof. This Agreement shall not be amended, modified or changed in any manner except by a writing signed by each party; provided, that, the terms and conditions under which Lender is willing to make any new Loans hereunder (including as reflected in the Loan Documents) may be changed or modified from time to time in Lender's sole discretion. The waiver or failure of any party to exercise in any respect any right provided for herein shall not be deemed a waiver of any further right hereunder. This Agreement shall not be assigned by a party without the prior written consent of the other party, which shall not be unreasonably withheld; provided, that, a party may assign its rights under this Agreement to any acquirer of such party's business or all or substantially all of such party's assets or pursuant to an assignment as a matter of law pursuant to a merger or otherwise. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their legal representatives, heirs, successors and permitted assigns.

21. <u>Third Party Beneficiary</u>. Except as stated herein with respect to Lender or the parties entitled to be indemnified hereunder (and their respective heirs, administrators, executors, successors, legal representatives and assigns), nothing expressed or referred to herein shall be construed to give any person or entity other than the parties hereto any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

22. <u>Inquiries; Feedback</u>. Neither party will attempt to answer inquiries from Borrowers or prospective Borrowers concerning the other party's products or services. Each party will

refer inquiries concerning the other party's products or services to the customer service telephone numbers provided by such other party.

23. Headings. The headings used in article and section references herein are for convenience of reference only and shall not be used in the interpretation of this Agreement.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

This Agreement is executed by the parties to be effective as of the Effective Date.

| CONTRACTOR: | PROVIDER: |
|---|---|
| Med-Den Funding, LLC | ███████████████ |
| ███████████████ | ███████████████ |
| (signature) | (signature) |
| By: David Roehr | By: ███████████████ |
| (print name) | (print name) |
| Title: CEO | Title: DDS |

14

Exhibit A

Calculation of Contractor Payment

| Loan Grade[1] | Contractor Percentage[2] |
|---|---|
| A | 3.90% |
| B | 4.90% |
| C | 6.90% |
| D | 9.90% |
| E | 14.90% |

---

[1] The loan grade is based on underwriting established by Lender.
[2] The Contractor Payment for a particular Loan shall be calculated based on the loan grade of such Loan by multiplying the applicable Contractor Percentage for such loan grade by the Financed Amount. By way of example only and for the avoidance of doubt, if the Financed Amount is $10,000 for a Loan Grade D (Contractor Percentage of 5.00%), the Contractor Payment would be $500 and the Provider Payment would be $9,500.

Exhibit B

Program Processes and Procedures

1. Provider Staff consults with Patient and determines whether a need for patient financing exists. Contractor or Lender will provide Program information, such as brochures, pamphlets, online calculators, etc., for review by prospective borrower.
2. Provider Staff directs Patient to the Portal that is accessible via internet-enabled computer or tablet or Patient's internet-enabled home computer or smart phone. The Portal will provide Patient direct access to the Application with just-in-time approval or rejection results.
3. Patient or Borrower completes required information and submits the Application using the Portal. Questions will be directed to Contractor or Third Party Servicer regarding the Program and financing options (if any, as determined by Lender) available.
4. Upon submission of the Loan Application, Patient will receive, via the Portal, an instant decision regarding Lender's approval or rejection of Patient's Loan request.
5. If Lender approves Patient for a Loan, Patient will be presented with all approved Loan options via the Portal. Certain terms and conditions associated with each Loan option offered to Patient will also be displayed.
6. Patient selects which Loan option (if more than one is offered by Lender) it wishes to accept via the Portal. Provider is notified via email once Patient has selected an approved Loan option from Lender.
7. Provider completes all pre-requisite consultations and services for Patient. Via the Portal (using the Provider login information) Provider certifies that the Patient has been cleared for treatment and that the Services will be provided to the Patient. Patient will receive, via email, a notification that Provider has provided this certification.
8. Via the Portal, Patient or Borrower accesses the certified Loan option and all required Loan Documents and related disclosures required by applicable Law.
9. Patient and/or Borrower executes the Loan Documents via electronic acknowledgement using the Portal, and authorizes the signed Loan Documents to be submitted to Lender. Patient or Borrower also has the option to print, wet sign, and upload Loan Documents to Lender via the Portal.
10. Lender sends funding notification to Provider via email. Payment for the Services provided by Provider to Patient will be funded by Lender, via ACH transfer, of the Financed Amount into an account designated by Provider within 1-2 business days of receiving signed Loan Documents; provided, that Lender will not fund a Financed Amount more than sixty (60) days prior to the date a Patient is scheduled to receive the Services which are the subject of the Loan. Borrower shall not receive or retain the Financed Amount.
11. The Loan, in the original principal amount of the Financed Amount, will be owed to Lender by Borrower. Servicing of the Loan on behalf of Lender will be provided by Third Party Servicer.